Slip Op. 24-73

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| H&E HOME, INC. and CLASSIC METALS SUPPLIERS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| and | : | |
| | : | Before: Richard K. Eaton, Judge |
| GLOBAL ALUMINUM DISTRIBUTOR LLC, INDUSTRIAS FELICIANO ALUMINUM, INC., JL TRADING CORP., and PUERTAS Y VENTANAS J.M., INC., | : | Consol. Court No. 21-00337 |
| | : | **PUBLIC VERSION** |
| Consolidated Plaintiffs, | : | |
| | : | |
| and | : | |
| | : | |
| KINGTOM ALUMINIO S.R.L., | : | |
| | : | |
| Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| THE ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | : | |
| | : | |
| Defendant-Intervenor. | : | |

**<u>OPINION</u>**

[U.S. Customs and Border Protection's results of redetermination after voluntary remand are sustained.]

Dated: June 17, 2024

   *Lizbeth R. Levinson*, Fox Rothschild LLP, of Washington, D.C., for Plaintiffs H&E Home, Inc. and Classic Metals Suppliers. With her on the brief was *Brittney R. Powell*.

   *David J. Craven*, Craven Trade Law LLC, of Chicago, IL, for Consolidated Plaintiff Global Aluminum Distributor LLC.

   *Beth C. Ring*, Sandler, Travis & Rosenberg, P.A., of New York, N.Y., for Consolidated Plaintiffs Industrias Feliciano Aluminum, Inc., Puertas y Ventanas J.M., Inc., and JL Trading Corp.

   *Jordan L. Fleischer*, Morris, Manning & Martin, LLP, of Washington, D.C., argued for Plaintiff-Intervenor Kingtom Aluminio S.R.L. With him on the brief were *Brady W. Mills*, *Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Mary S. Hodgins*, *Eugene Degnan*, and *Nicholas C. Duffey*.

   *Alexander J. Vanderweide*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Aimee Lee*, Assistant Director, and *Justin R. Miller*, Attorney-In-Charge, International Trade Field Office. Of counsel on the brief was *Tamari J. Lagvilava*, Office of the Chief Counsel, U.S. Customs and Border Protection.

   *Elizabeth S. Lee*, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenor Aluminum Extrusions Fair Trade Committee. With him on the brief were *Robert E. DeFrancesco, III* and *Alan H. Price*.

   Eaton, Judge: Under the Enforce and Protect Act ("EAPA"),[1] U.S. Customs and Border Protection ("Customs") determines whether an importer has entered merchandise that is subject to an antidumping or countervailing duty order into the United States through evasion, resulting in the avoidance of paying the duties owed under the order. *See* 19 U.S.C. § 1517 (2018).

   This consolidated EAPA action[2] was commenced by U.S. importers of aluminum extrusions. Plaintiffs are H&E Home, Inc. ("H&E Home") and Classic Metals Suppliers ("Classic

---

[1]    The EAPA was enacted as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, § 421, 130 Stat. 122, 161 (2016), which added section 517 to the Tariff Act of 1930.

[2]    On August 3, 2021, the court consolidated *Global Aluminum Distributor LLC v. United States*, Court No. 21-00312, and *Industrias Feliciano Aluminum, Inc. v. United States*,

Metals") ("Plaintiffs"). Consolidated Plaintiffs are Global Aluminum Distributor LLC ("Global Aluminum"),[3] Industrias Feliciano Aluminum, Inc. ("Industrias"), Puertas y Ventanas J.M., Inc. ("Puertas"), and JL Trading Corp. ("JL Trading") ("Consolidated Plaintiffs"). The court will use the term "Plaintiff Importers" when referring to Plaintiffs and Consolidated Plaintiffs together.

Plaintiff-Intervenor Kingtom Aluminio S.R.L. ("Kingtom") is a Chinese-owned producer and exporter of aluminum extrusions located in a free trade zone in the Dominican Republic. *See* Mem. to the File, EAPA Case No. 7423: Aluminum Extrusions from the Dominican Republic, attach. 1 (Jan. 28, 2020) ("Attaché Report"), CR 14.

Before the court are Customs' results of redetermination after voluntary remand.[4] *See* Remand Redetermination, EAPA Case No. 7423 (Jan. 5, 2023) ("Remand Results"), ECF No. 73; *see also* Order (Sept. 7, 2022) ("Remand Order"), ECF No. 70 (granting Customs' voluntary remand motion).

In the Remand Results, Customs' Office of Regulations and Rulings ("R&R") reconsidered the record evidence,[5] in particular Kingtom's production data, and determined that substantial

---

Court No. 21-00317, with the lead case, *H&E Home, Inc. v. United States*, Court No. 21-00337. *See* Order (Aug. 3, 2021), ECF No. 15.

[3]    Global Aluminum has informed the court that it is "no longer in operation and does not have the resources to actively participate in this matter. . . . Global Aluminum supports and adopts by reference the motions and case briefs filed by Plaintiffs, Consolidated Plaintiffs and Plaintiff-Intervenor in this matter." Global Aluminum's Notification to Ct. (July 24, 2023), ECF No. 88.

[4]    This case was remanded to Customs before dispositive motions were filed. Thus, after remand, the parties filed motions for judgment on the agency record, which are supported by their respective comments on the Remand Results, in accordance with the court's scheduling order. *See* Order (Jan. 31, 2023), ECF No. 79.

[5]    As will be seen, R&R originally affirmed the evasion determination made by Customs' Trade Remedy Law Enforcement Directorate, or TRLED, during an administrative

evidence did not support a finding that the Plaintiff Importers evaded the antidumping and countervailing duty orders (the "Orders")[6] on aluminum extrusions from the People's Republic of China ("China") by importing aluminum extrusions produced by Kingtom that were, at least in part, transshipped[7] from China. Finding Kingtom's production data reliable, R&R determined that Kingtom had the capacity and capability to produce aluminum extrusions in the quantities that were exported to the United States. *See* Remand Results, Addendum at 3 ("After further reconsideration, we find that the record does not contain sufficient evidence to meet the evidentiary standard of substantial evidence of evasion because documents within the record were erroneously disregarded as unreliable during the investigation and original *de novo* review."). Thus, on remand R&R reversed its original affirmative evasion determination.

By its motion for judgment on the agency record, Defendant-Intervenor Aluminum Extrusions Fair Trade Committee (the "Committee"), a coalition of U.S. aluminum extrusion producers, opposes the Remand Results and asks the court to remand this matter to Customs for

---

review. *See* Decision on Request for Admin. Review, EAPA Case No. 7423 (June 4, 2021), PR 712. Then, in the Remand Results, R&R reconsidered the record evidence and reversed the evasion determination. R&R's decision is contained in an addendum to the Remand Results.

[6]    *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011).

[7]    "Transshipment [is] where goods are manufactured in one country and imported through an intermediary country to evade duties imposed on goods originating from the manufacturing country . . . ." *Skyview Cabinet USA, Inc. v. United States*, No. 22-00080, 2023 WL 4073781, at *6 (CIT June 20, 2023) (citing *CEK Grp. LLC v. United States*, 47 CIT __, __, 633 F. Supp. 3d 1369, 1378-80 (2023)). Customs' recently amended regulations identify transshipment as an example of evasion. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 89 Fed. Reg. 19,239, 19,258 (Dep't of Homeland Sec. Mar. 18, 2024) (final rule) (amending 19 C.F.R. § 165.1 definition of "*Evade or Evasion*" to add examples of evasion, "includ[ing] but . . . not limited to, the transshipment, misclassification, and/or undervaluation of covered merchandise").

reconsideration. *See* Def.-Int.'s Mot. J. Agency R. & Cmts. Opp'n Remand Results ("Def.-Int.'s Cmts."), ECF No. 82.

Defendant the United States ("Defendant"), on behalf of Customs, has filed comments in response to the Committee's motion for judgment on the agency record, asking the court to sustain the Remand Results. *See* Def.'s Resp. to Def.-Int.'s Mot. J. Agency R. ("Def.'s Resp."), ECF No. 84.

By their respective motions for judgment on the agency record, Plaintiff Importers and Kingtom also ask the court to sustain the Remand Results. *See* Pls.' Mot. for J. on the Agency R. & Cmts. Supp. Remand Results ("Pls.' Cmts."), ECF No. 89; Consol. Pls.' Cmts. Mot. for J. on the Agency R. & Supp. Remand Results ("Consol. Pls.' Cmts."), ECF No. 85; Pl.-Int.'s Mot. for J. on the Agency R. & Cmts. Supp. Remand Results ("Pl.-Int.'s Cmts."), ECF No. 90.

The court has jurisdiction under 19 U.S.C. § 1517(g) and 28 U.S.C. § 1581(c) (2018). For the following reasons, the Committee's motion is denied, the Plaintiff Importers' and Kingtom's respective motions are granted, and the Remand Results are sustained.

**LEGAL FRAMEWORK**

**I.    Evasion Determinations Under the EAPA**

Under the EAPA, Customs determines whether covered merchandise has entered the United States through evasion. *See* 19 U.S.C. § 1517(c)(1). "Covered merchandise" is merchandise that is subject to an antidumping or countervailing duty order. *Id.* § 1517(a)(3). As defined by the statute, "evasion" means

> entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable

> antidumping or countervailing duties being reduced or not being applied with
> respect to the merchandise.

*Id.* § 1517(a)(5)(A). Customs has promulgated regulations providing the requirements for filing allegations of evasion and requests for investigation, investigation procedures, and administrative review of determinations as to evasion of antidumping or countervailing duty orders. *See* 19 C.F.R. § 165.0 (2020).[8]

The EAPA authorizes Customs to use adverse inferences when making an evasion determination:

> If the [Commissioner of U.S. Customs and Border Protection] finds that a party or person . . . has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner *may*, in making a[n evasion] determination under [19 U.S.C. § 1517(c)(1)], use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

19 U.S.C. § 1517(c)(3)(A) (emphasis added); *see* 19 C.F.R. § 165.6(a). An adverse inference "may be used . . . without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation." 19 U.S.C. § 1517(c)(3)(B); *see* 19 C.F.R. § 165.6(c).

---

[8]    Customs' regulations that were in effect in 2020 apply in this case. The court notes, however, that on April 17, 2024, Customs' recently amended regulations went into effect. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 89 Fed. Reg. at 19,239. Of particular note is the addition of a procedure for Customs to issue an administrative protective order "which will contain terms to allow the representatives of parties to the investigation to access the business confidential information" submitted to Customs by an interested party, following the Federal Circuit's 2023 *Royal Brush* decision. *See* 19 C.F.R. § 165.4(f) (2024); *see Royal Brush Mfr., Inc. v. United States*, 75 F.4th 1250, 1259-60 (2023) (holding that where Customs "relied on factual information that was not provided to [the importer] Royal Brush to determine that Royal Brush had evaded duties . . . [t]his, in and of itself, is a clear violation of due process," and that Customs "has the inherent authority to utilize protective orders in appropriate circumstances" to protect confidential information).

In other words, Customs may decide to use adverse inferences, whether or not information is missing from the record, if it finds that the person from whom Customs has requested information failed to cooperate with that request to the best of its ability. *See CEK Grp. LLC v. United States*, 47 CIT __, __, 633 F. Supp. 3d 1369, 1378-79 (2023) (rejecting the argument "that adverse inferences as defined by § 1517(c)(3) can only be applied when there is a gap in the record," and finding that according to the plain meaning of that statute, "whether a gap exists is not necessarily determinative" of whether Customs may use an adverse inference).

When Customs applies adverse inferences, it may rely on information derived from "(i) the allegation of evasion of the trade remedy laws, if any, submitted to [Customs]; (ii) a determination by the Commissioner in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or (iii) any other available information." 19 U.S.C. § 1517(c)(3)(C).

## II.    Investigations and Administrative Appeals Under the EAPA

Customs' Office of Trade handles EAPA cases. In particular, the Trade Remedy Law Enforcement Directorate ("TRLED"), within the Office of Trade, investigates allegations of evasion and makes an evasion determination. *See* 19 U.S.C. § 4371(a)(3) (authorizing TRLED to direct EAPA enforcement efforts); *see also* 19 C.F.R. § 165.1 (defining TRLED as the Trade Remedy Law Enforcement Directorate, Office of Trade that "conducts the investigation of alleged evasion").

The EAPA establishes the requirements for TRLED to initiate an investigation and to implement interim measures.[9] *See* 19 U.S.C. § 1517(b)(1) ("Not later than 15 business days after

---

[9]    Interim measures include the suspension of liquidation of unliquidated entries of covered merchandise that entered on or after the initiation of the investigation, extension of the

receiving an allegation . . . the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation . . . *reasonably suggests* that covered merchandise has been entered into the customs territory of the United States through evasion." (emphasis added)); *see also id.* § 1517(e)(1)-(3) (enumerating the interim measures that Customs shall implement if, "[n]ot later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner . . . decide[s] based on the investigation [that] there is a *reasonable suspicion* that such covered merchandise was entered into the customs territory of the United States through evasion" (emphasis added)).

        Ultimately, TRLED must determine whether substantial evidence supports a finding that "covered merchandise was entered into the customs territory of the United States through evasion." *See id.* § 1517(c)(1)(A) (providing that "the Commissioner shall make a determination, *based on substantial evidence*, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion" (emphasis added)).

        Once TRLED has concluded its investigation, and should it make an affirmative evasion determination, the EAPA permits an administrative appeal of that determination. *See id.* § 1517(f)(1) ("[A] person determined to have entered . . . covered merchandise through evasion or [the] interested party that filed [the] allegation . . . may file an appeal with the Commissioner for de novo review of the [TRLED's evasion] determination.").

        If a request for administrative appeal is filed, Customs' Office of Regulations and Rulings, or R&R, within the Office of Trade, considers the appeal, applying a de novo standard of review.

---

period for liquidating unliquidated entries of covered merchandise that entered before the investigation was initiated, and "such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise." 19 U.S.C. § 1517(e)(1)-(3).

*See* 19 C.F.R. § 165.1 (defining Regulations and Rulings); *id.* § 165.45 ("[R&R] will apply a de novo standard of review and will render a determination appropriate under law according to the specific facts and circumstances on the record."). R&R has sixty business days to complete its review. *See* 19 U.S.C. § 1517(f)(2).

Thereafter, parties may seek judicial review of TRLED's evasion determination and R&R's review of that determination in this Court. *See id.* § 1517(g)(1) (permitting parties to "seek judicial review of the [TRLED] determination under subsection (c)[10] and the [R&R] review under subsection (f)[11] in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f).").

---

[10]      Subsection (c)(1)(A) provides that, not later than 300 calendar days after the date of initiation of an investigation, "the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(c)(1)(A).

[11]      Subsection (f) provides, in part:

Not later than 30 business days after the Commissioner makes a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may file an appeal with the Commissioner for de novo review of the determination.

19 U.S.C. § 1517(f)(1).

## BACKGROUND

### I.    TRLED's Investigation and R&R's Administrative Review in EAPA Case No. 7423

On January 27, 2020, TRLED initiated a consolidated investigation[12]—EAPA Case No. 7423—in response to allegations filed by the Committee claiming that the Plaintiff Importers evaded the Orders by importing aluminum extrusions produced by Kingtom that were, at least in part, transshipped from China. *See* Letter from Customs to All Parties, Notice of Initiation of Investigation and Interim Measures, EAPA Case No. 7423 at 1-2 (May 4, 2020) ("Investigation Initiation Memo"), CR 58. The period of investigation commenced on January 10, 2019, and continued through the pendency of the investigation, i.e., until January 28, 2021.[13] *Id.* at 2; Decision on Request for Admin. Review, EAPA Case No. 7423 (June 4, 2021), PR 712.

On May 4, 2020, TRLED imposed interim measures, having found that "reasonable suspicion exists that aluminum extrusions produced by Kingtom and entered into the customs territory of the United States by the Importers are, at least in part, transshipped from China, and thus, are evading the Orders on aluminum extrusions from China." Investigation Initiation Memo at 10. As interim measures, TRLED stated that it would "[s]uspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after [January 27, 2020,] the date of the initiation of the investigation" and "extend the period for liquidating each unliquidated

---

[12]    TRLED consolidated seven investigations, covering the six Plaintiff Importers plus a seventh company that is not a party to this action, into a single investigation (EAPA Case No. 7423) with one administrative record. *See* Investigation Initiation Memo at 10.

[13]    The period of investigation of EAPA Case No. 7423 overlapped with the period of investigation in EAPA Case No. 7348, which also involved an allegation of evasion with respect to aluminum extrusions produced by Kingtom. Specifically, the two periods overlapped from January 2019 to November 2020. Documents from the administrative record of EAPA Case No. 7348 were placed on the record of the instant investigation (EAPA Case No. 7423). Notice of Final Determination as to Evasion, EAPA Consol. Case No. 7423 at 3 n.7 (Jan. 28, 2021), CR 824.

entry of such covered merchandise that entered before the date of the initiation of the investigation." *Id.* Additionally, TRLED would "take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise." *Id.* Finally, "[Customs] [would] require live entry,"[14] "reject any entry summaries that do not comply, . . . require refiling of entries that are within the entry summary rejection period," and "evaluate the Importers' continuous bonds to determine sufficiency." *Id.*

On January 28, 2021, TRLED determined that substantial evidence on the record supported the conclusion that Plaintiff Importers entered aluminum extrusions from China into the United States through evasion. *See* Notice of Final Determination as to Evasion, EAPA Case No. 7423 at 5-6 (Jan. 28, 2021), CR 824.

Plaintiff Importers thereafter asked R&R to review TRLED's affirmative evasion determination. *See, e.g.*, Letter from Diaz Trade Law to Customs, Allegation Control Number: EAPA Case No. 7423, Global Aluminum Distributor, LLC's Request for Administrative Review (Mar. 12, 2021), CR 828.

On June 4, 2021, R&R affirmed TRLED's determination of evasion. *See* Decision on Request for Admin. Review, EAPA Case No. 7423.

---

[14]    "Live entry" procedures require the importer of record "to provide necessary paperwork and pay duties *before* the imported merchandise is released into the U.S. market," to allow Customs to confirm entry paperwork is in order, in contrast to "routine requirements that allow imports to be released into the U.S. market days before the importer is required to file paperwork and pay duties." Melissa M. Brewer & Paul C. Rosenthal, *CBP Ramps Up Enforcement Efforts With "Live Entry" Requirements for Steel Imports Subject to AD/CVD Orders*, KELLEY DRYE & WARREN LLP (Mar. 30, 2016) https://www.lexology.com/library/detail.aspx?g=0d21a208-8a9d-4a53-be72-727978d7f6b4 (last visited June 14, 2024) (emphasis added).

## II.    Proceedings Before This Court

Plaintiff Importers then challenged the affirmative evasion determination in this Court in three separate actions that were consolidated under the lead case, *H&E Home, Inc. v. United States*, Consolidated Court No. 21-00337. Kingtom intervened on the side of Plaintiffs. *See* Order (Oct. 13, 2021), ECF No. 33.

On November 18, 2021, the court stayed this consolidated case pending the outcome of *Global Aluminum Distributor LLC v. United States*, Court No. 21-00198, which concerned EAPA Case No. 7348. *Global Aluminum* involved an allegation by Ta Chen International Inc., a U.S. importer of aluminum extrusions, that Global Aluminum (also a U.S. importer) entered Chinese-origin aluminum extrusions into the United States through evasion. In *Global Aluminum*, Customs moved for voluntary remand to reconsider its original affirmative determination of evasion, which the Court granted. *See Global Aluminum Distributor LLC v. United States*, 46 CIT __, __, 585 F. Supp. 3d 1352, 1355 (2022).

On remand in *Global Aluminum*, R&R reversed its original affirmative determination and concluded that there was no evasion. On August 8, 2022, the Court sustained Customs' uncontested remand redetermination. *Id.*

On July 13, 2022, the court lifted the stay in this action. *See* Order (July 13, 2022), ECF No. 62. Customs then filed a motion for voluntary remand, with the consent of all parties except for the Committee, which opposed the motion. The motion stated that remand was needed so that Customs could "correct certain procedural deficiencies in the administrative record." Def.'s Mot. for Voluntary Remand ("Remand Motion") at 4, ECF No. 65. That is, "[Customs] placed certain business confidential information on the underlying administrative record, including summaries of site visits and responses to [Customs'] Requests for Information, but the agency did not provide

the parties with public summaries of the confidential information as required by regulation and

precedent, and as requested by the parties." *Id.* at 5. Additionally, Customs stated that "multiple

documents were mistakenly omitted from the administrative record, and were thus not reviewed

by R&R when rendering its decision on evasion." *Id.* Finally, Customs asked for remand so that it

could "reevaluate the record evidence in light of its remand determination in [*Global Aluminum

Distributor LLC v. United States*, Court No. 21-00198] and to reconsider its finding of evasion."

*Id.* at 6. Finding that that Customs' reasons for requesting remand, as stated in its motion, were

"substantial and legitimate," the court granted the motion. *See* Remand Order at 2.


III.    **The Remand Results**

On January 10, 2023, Customs filed the Remand Results with the court. The Remand

Results are comprised of two decisions: (1) a decision by TRLED that addresses "the procedural

aspects of the remand order – which are, the addition and provision of public summaries on the

administrative record and the forwarding of inadvertently omitted documents from the record to

R&R for consideration," Remand Results at 2; and (2) a decision by R&R which "focuses upon

the central issue of whether there is substantial record evidence of evasion," i.e., R&R's

reconsideration of its original evasion determination, taking into account *Global Aluminum* and

the documents that previously had been omitted from the record. Remand Results, Addendum at 3.

A.    **TRLED's Decision on the Procedural Aspects of the Remand Order**

1.    **Public Summaries Required by 19 C.F.R. § 165.4 (2020)**

Customs' regulations governing the treatment of business confidential information[15] in EAPA cases require labeling and bracketing of the information claimed to be confidential. *See* 19 C.F.R. § 165.4(a)(1), (e). "An interested party filing a submission containing claimed business confidential information must also file a public version of the submission," which must comply with certain requirements:

> The public version must be filed on the same date as the business confidential version and contain a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information. If the submitting interested party claims that summarization is not possible, the claim must be accompanied by a full explanation of the reasons supporting that claim. The public version must be clearly marked as a public version on the first page.

*Id.* § 165.4(a)(2). The public summarization rule applies not only to interested parties but also to Customs: "Any information that [Customs] places on the administrative record, when obtained other than from an interested party subject to the requirements of this section, will include a public summary of the business confidential information as described in [§ 165.4(a)(2)], when applicable." *Id.* § 165.4(e); *see also id.* § 165.1 (defining "interested party" as including, among others, the importer alleged to have entered merchandise through evasion and the foreign producer). *See Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 47 CIT __, __, 578 F. Supp. 3d 1310, 1321 (2022) (remanding for Customs to provide an "explanation regarding confidential

---

[15]    Business confidential information is defined by regulation as information "consist[ing] of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. 552(b)(4)." 19 C.F.R. § 165.4(a) (2020). Section 552(b)(4) of the U.S. Code excepts from public disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

treatment and public summarization of allegedly confidential information," where Customs had provided inconsistent treatment of allegedly business confidential information).

It is worth repeating that Customs' Remand Motion stated that remand was necessary, in part, because "[*Customs*] [had] placed certain business confidential information on the underlying administrative record" without including public summaries in violation of 19 C.F.R. § 165.4. Remand Motion at 5 (emphasis added). But on remand, Customs did more than merely remedy its own violation of the regulation. Rather, on remand, TRLED re-opened the record and "requested that *the parties* to the remand [i.e., the Committee, Plaintiff Importers, and Kingtom,] review business confidential documents each entity previously submitted to the administrative record and provide *revised public summaries* compliant with 19 C.F.R. § 165.4(a)(2)." Remand Results at 8 (emphasis added). TRLED provided sample summaries to guide the parties. *Id.* at 21. It also provided the parties with "an opportunity to submit rebuttal information and written argument" relevant to the revised versions. *Id.* at 7.

The Committee, Plaintiff Importers, and Kingtom submitted revised public summaries. But the public summaries submitted by some of the importers, i.e., Global Aluminum, Industrias, Puertas, and JL Trading, were rejected by TRLED for failing to comply with the requirements of 19 C.F.R. § 165.4(a)(2). Specifically, Customs found that certain documents were merely redacted, i.e., a public summary of the redacted information was not provided. Customs rejected the documents that these companies submitted. *See* Consol. Pls.' Cmts. at 17 (TRLED email of Oct. 14, 2022). TRLED extended the deadline by which these importers could submit public summaries, but the companies did not submit anything further. *See* Remand Results at 10.

For its part, Customs submitted revised public summaries of business confidential information, obtained from other investigations,[16] that it had placed on the record, as required by 19 C.F.R. § 165.4(e). Remand Results at 10 ("TRLED added revised public summaries to its previously bracketed and redacted public versions of business confidential documents.").

Customs permitted the parties to submit written arguments based on the revised public versions of the confidential documents that they would have submitted if they had had access to the public summaries during the original investigation. Remand Results at 11. The deadline set by TRLED for the arguments was November 7, 2022. On November 7, the Committee submitted written arguments. On November 22, 2022, Industrias, Puertas, and JL Trading submitted rebuttal arguments, which Customs rejected as untimely. *See id.*

### 2.    Transmission of Omitted Record Documents to R&R

TRLED also "transmitted to R&R . . . documents that were part of the administrative record during the EAPA investigation, but which had been inadvertently omitted when the administrative record was originally transferred to R&R for its *de novo* review." Remand Results at 4. "Among the documents previously omitted from R&R's review were: (1) Entry Data Reports and Fact Sheets; (2) CBP Form 28 Responses and cover letters from Industrias; and, (3) Record evidence

---

[16]    The business confidential information with respect to which TRLED submitted revised public summaries seems to be materials from other EAPA investigations. *See* Remand Results at 14 (describing the confidential business information as "DC NTAC data reports (EAPA Cases 7422-7429), DC NTAC Report Factsheets (EAPA Cases 7422-7429), Final Determination of Evasion (EAPA Case 7423), Final Determination of Evasion (EAPA Case 7348), Initiation Memoranda to File for EAPA Cases (EAPA Cases 7423- 7426, 7428-7429), Internal Emails for Initiation (EAPA Cases 7422-7429), Internal Email for Interim Measures (EAPA Cons. Case 7423), Memoranda to File CBP Site Visit to Kingtom (EAPA Cases 7423-7429), Notice of Initiation of Investigation and Interim Measures (EAPA Case 7348), and Notice of Interim Measures (EAPA Case 7423).").

from [EAPA Case No. 7348[17]] added to the record of this EAPA investigation." *Id.* at 4-5.

"TRLED also transmitted to R&R documents submitted to TRLED during this remand proceeding,

to include the written arguments of the alleger, [the Committee], dated November 7, 2022." *Id.*

at 5.

### 3.    TRLED Declines to Apply Adverse Inferences on Remand

TRLED then distributed its draft remand decision and asked for the parties' comments.

The Committee argued that TRLED should apply adverse inferences to Global Aluminum,

Industrias, Puertas, and JL Trading for failing to resubmit corrected public summaries, which, for

the Committee, was a failure on the part of each company to cooperate to the best of its ability,

under the adverse inference provision of the EAPA statute. Def.-Int.'s Cmts. at 32; *see* 19 U.S.C.

§ 1517(c)(3)(A) (providing that Customs "may" use an adverse inference against a party when

making an evasion determination if that party "has failed to cooperate by not acting to the best of

the party or person's ability to comply with a request for information").

For their part, Global Aluminum, Industrias, Puertas, and JL Trading argued that an adverse

inference was not warranted because the parties' submission of revised public summaries was not

required by the court's Remand Order. *See* Consol. Pls.' Cmts. at 6 ("Nowhere in the government's

remand motion did the government even suggest that it was seeking a remand to require the

complete refiling of thousands of pages of documents already submitted, vetted and accepted by

CBP pursuant to 19 C.F.R. §165.4(a)(2)."). In other words, for these importers, TRLED had

misunderstood the scope of the court's order by requiring *the parties* to submit public summaries

---

[17]    As discussed *supra* pages 12-13, EAPA Case No. 7348 also involved an allegation
of evasion with respect to aluminum extrusions produced by Kingtom. It was the investigation
underlying the *Global Aluminum* case, in which R&R reversed its original affirmative
determination and concluded that there was not substantial evidence of evasion.

of hundreds of documents on remand, instead of requiring only *Customs* to submit public

summaries of documents that it had omitted to place on the record. *Id.* at 5-13.

In the Remand Results, TRLED declined to apply adverse inferences, stating, by way of

explanation:

> **First,** the decision to apply adverse inferences is discretionary, in that both
> 19 U.S.C. §1517(c)(3) and 19 C.F.R. § 165.6(a), provide that [Customs] "*may*", not
> "shall," apply adverse inferences upon finding that a party failed to cooperate to the
> best of its ability. As such, by statute, [Customs] is not required to apply adverse
> inferences even if parties fail to cooperate to the best of their ability to [Customs]'s
> request for information. **Second**, in determining that it would not apply adverse
> inferences, [Customs] considered the procedural posture of this case – that the
> original documents submitted by all parties are on the administrative record. As
> such, the failure of the four importers to resubmit revised public summaries did not
> create a gap of information on the administrative record, as on remand [Customs]
> was not requesting any new information, but revised public versions of information
> already on the administrative record. To apply [an] adverse inference for failure to
> resubmit public versions, on remand, would be futile as [Customs] already
> reviewed and considered confidential versions of all documents and the parties have
> already accessed such documents under the judicial protective order. **Third**,
> [Customs] determined that, in order to comply with the remand order, TRLED
> would address procedural deficiencies on the record, while R&R would "revisit and
> reweigh the record evidence in light of [Customs]'s remand determination in EAPA
> Consol. Case No. 7348, *Global Aluminum Distributor LLC et al. v. United States
> et al,* Court No. 21-00198[.]"

Remand Results at 18-19 (emphasis added). Thus, TRLED found that, "in light of the unique

circumstances of this remand, [Customs] has declined to apply adverse inferences to the parties'

failure to resubmit the requested revised public versions of business confidential information." *Id.*

at 19.

In sum, TRLED described the actions it took on remand with respect to the procedural

aspects of the court's Remand Order:

> In accordance with the Court's remand order, [Customs] analyzed various issues
> including compliance with the relevant regulations governing the treatment of
> public summaries. TRLED allowed the parties to submit revised public versions of
> business confidential documents on the administrative record and placed revised
> public versions, containing public summaries, of business confidential documents

> that it previously placed on the record. After doing so, [Customs] permitted the parties to the investigation to submit rebuttal information and additional arguments. Further, TRLED transmitted all documents and information previously omitted from the record, as well as any information and arguments submitted on remand, to R&R for review.

*Id.* at 25. Thus, TRLED maintains that it has complied with the court's instructions as to the procedure to follow on remand.

### B.    R&R's Decision on Evasion

#### 1.    R&R's Determination That Substantial Evidence Does Not Support a Finding of Evasion

For its part, on remand, R&R reconsidered its earlier affirmative evasion determination, and changed course, ultimately finding that substantial evidence did not support a finding of evasion. *See* Remand Results, Addendum at 3. "After further reconsideration, [R&R found] that the record does not contain sufficient evidence to meet the evidentiary standard of substantial evidence of evasion because documents within the record were erroneously disregarded as unreliable during the investigation and original *de novo* review." *Id.*

In its remand decision, R&R noted that its analysis that led to the original affirmative evasion determination "primarily" focused on "alleged discrepancies" (which are discussed below) in Kingtom's responses, and "disregard[ed] the remaining *record evidence demonstrating Kingtom's production capabilities and capacity* and *explanations* for a majority of the [alleged] discrepancies." *Id.* at 4 (emphasis added). Thus, R&R stated, "upon further review of the administrative record, we find that our focus on the claimed discrepancies was misplaced, and that substantial evidence on the record as a whole does not support a finding of evasion." *Id.*

Relying on record evidence, R&R stated, by way of explanation, why the record supported a finding of non-evasion:

As shown within the record, Kingtom documented its daily production per each aluminum extrusion press as part of its normal course of business and provided such documentation to [Customs] in response to the initial Request for Information . . . in EAPA Cons. Case No. 7348. There is nothing in the record to discredit these daily production records as unreliable or to otherwise contradict Kingtom's assertions that such records were kept in the normal course of business. While [the Committee] is correct in its Comments on Draft Remand Redetermination that the production records do not show Kingtom operating at full capacity, that does not mean Kingtom did not produce all of its aluminum extrusion exports to the United States, as operating at full capacity was not required to meet the exportation quantities at issue. The record shows that, when the number of aluminum extrusion presses was cited in statements regarding site visits, there was never fewer than three (3) operable aluminum extrusion presses observed at Kingtom. Kingtom provided the monthly production capacity for three (3) aluminum extrusion presses in its initial [Request for Information] Response, *demonstrating the ability to manufacture the full amount of goods it exported to the United States*. Kingtom also produced additional records to demonstrate the addition of more extrusion presses over the course of time when the site visits occurred and later on during the period of investigation. One of the alleger's experts observed seven (7) aluminum extrusion presses during his visit to the facility. These additional extrusion presses also had varying total production capacities and a greater capacity to produce larger aluminum extrusions that Kingtom exported to the United States. This would help account for the increased production numbers seen in Kingtom's production records over time. Indeed, the other expert declaration provided by the alleger regarding visits to Kingtom provided a rough calculation of the monthly capacity, under realistic conditions, for only the smallest aluminum extrusion press found at the facility, but did not provide similar calculations for the two larger aluminum extrusion presses that he observed, despite acknowledging that larger presses would have a greater output. There are no other calculations of the aluminum extrusion press capabilities and capacities found within the record, except for what Kingtom has provided. The record does not show that Kingtom ever exported aluminum extrusions in amounts that exceeded the provided overall maximum capacity, nor does the record indicate that the amount of days/time that the aluminum extrusion presses were running and producing at Kingtom would not fulfill the orders placed. In other words, *no evidence has been provided that contradicts that Kingtom had the production capacity to produce the U.S. exports based on the number of presses that were in operation during the period of investigation*.

The record evidence includes copies of purchase orders, employee records, contracts, bank records, invoices, financial statements, production records, raw material purchase documentation, videos, and photographs, all indicating that *Kingtom had the capacity and capability to produce aluminum extrusions in its Dominican Republic factory in the quantities that were exported to the United States on a custom order basis*. This documentation has not been shown to be unreliable and no evidence on the record contradicts it. All of this documentation needed analysis and consideration before conclusions could be reached regarding

Kingtom's production capacity. The TRLED January 28 Determination and the R&R June 4 FAD did not provide such an analysis but, rather, placed much significance and weight upon the alleger's site visit declarations to find a lack of production capacity at Kingtom.

The [original affirmative evasion determinations by TRLED and R&R] focused more upon claimed discrepancies found within the documents provided by Kingtom during the investigation in EAPA Cons. Case No. 7348, to bolster a finding of substantial evidence of evasion. Upon further reflection and analysis, however, *we now find that many of those discrepancies either have logical explanations provided during the investigation and/or final administrative review process which were erroneously disregarded or never received proper follow-up during the course of the investigation.* As a result, we cannot justify placing such great weight on the perceived discrepancies, and we must reverse course as to our original finding of substantial evidence of evasion.

Remand Results, Addendum at 4-5 (emphasis added). In other words, R&R concluded that substantial evidence on the record showed that during the period of investigation Kingtom had the production capacity and capability to meet the demands of its U.S. customers for custom-made aluminum extrusions during the period of investigation. In the face of this record evidence, R&R found, the reliance on any claimed "discrepancies" in the data, the majority of which could be explained, was in error.

For example, R&R describes a "claimed discrepancy" as the difference between the amount of aluminum extrusions that Kingtom produced in a month and the amount of Kingtom's sales in that month. In R&R's original affirmative determination (reviewing TRLED's affirmative evasion determination), this difference was treated as evidence that Kingtom's production information was not reliable, but on remand R&R found that, in fact, there was no "discrepancy" in Kingtom's production and sales:

Most significantly, although not discussed in the R&R['s original affirmative evasion determination], the TRLED['s affirmative evasion determination] appears to conflate the monthly theoretical production volume and monthly sales volume figures provided by Kingtom and treat them as interchangeable when they are wholly different figures. *As Kingtom produces aluminum extrusions customized to the specifications of each of its customers, it*

> *stands to reason that production numbers would fluctuate between months, as the number of orders produced in a given month would depend on the number of orders received. At the same time, monthly production numbers would not mirror monthly sales numbers, as production of an order could straddle two different months or otherwise be completed in one month but not shipped until the next.* Even if Kingtom had continuous, consistent production (*i.e.,* did not produce customized aluminum extrusions to order) throughout each month, the monthly sales volume would still fluctuate depending upon the number of orders received and filled in each month. This multi-month timeline for an order's receipt, production and exportation was illustrated by Kingtom in its [Request for Information] Response provided in EAPA Cons. Case No. 7348 [the record of which was placed on the administrative record in this investigation, Case No. 7423]. It shows that the order was placed in February 2020 but was not fully prepared and ready for shipment until March 2020. Generally speaking, it stands to reason that production and sales numbers cannot be viewed within rigid timeframes and expected to mirror one another due to fluctuations and the realities of manufacturing. *This alleged discrepancy goes to the core question presented in this case and is indeed not a discrepancy;* the [R&R, in its original affirmative evasion determination] erred in not addressing this point. We correct that error in this remand redetermination.

*Id.* at 5-6 (emphasis added). In other words, because Kingtom made aluminum extrusions to order, and the orders were not necessarily completely filled in the same month, its production and sales figures understandably varied month to month, and thus the difference between production and sales figures was not a "discrepancy."

Other perceived "discrepancies" in the production data that R&R now finds are capable of explanation, and thus not evidence of unreliability, include:

(1) that Kingtom's aluminum extrusion presses could not produce the sizes of aluminum extrusions exported to the United States, according to the Committee's (i.e., the alleger's) expert. On remand, R&R found that "[t]here is no evidence within the record . . . that limitations on the production capabilities of the aluminum extrusion presses at Kingtom were tested and proven correct," nor does the expert "state definitively that Kingtom could not produce the size of the aluminum extrusions, nor is there evidence that Kingtom was

asked about the sizes of the aluminum extrusions that its presses could produce." Remand

Results, Addendum at 6;

(2) that "differences found between Kingtom's bank statements and its accounts receivable

records or the bank statements of some of the Importers" made these documents unreliable.

*Id.* Upon reconsideration, R&R found that "[a] majority of those differences in payment

amounts by the Importers and the actual amount deposited into Kingtom's bank account

are consistently small figures," which appear to be "transaction fees" charged by

Kingtom's bank. *Id.* Also, for R&R, minor discrepancies in banking records have nothing

to do with aluminum extrusion production capacity. *Id.*; and

(3) that when the Committee's experts visited Kingtom's facility, "not all of the aluminum

extrusion presses were operating at full capacity." *Id.* at 7. But because the experts did not

provide the day or the time when their site visits took place (only the month and the year),

their observations could not be compared with the information in Kingtom's production

documents that were placed on the record. *Id.*

## 2.    R&R's Finding That TRLED Failed to "Follow Up" on Claimed Discrepancies

In the Remand Results, R&R, in reviewing the record before it, found that during TRLED's

investigation, TRLED failed to "follow up" on the claimed discrepancies, and that, had TRLED

done so, it would have found that the discrepancies could be explained:

> Given that other perceived discrepancies, such as the financial discrepancies
> detailed above, have alternate explanations, without the needed follow-up to
> ascertain whether these discrepancies have a logical explanation, this evidence on
> the record cannot outweigh the rest of the record that points to Kingtom's having
> sufficient production capacity and capability to produce aluminum extrusions in the
> quantities and sizes that it claims to have produced.

Remand Results, Addendum at 6-7. Thus, R&R found:

> In this case, the lack of proper follow-up during the investigation regarding possible discrepancies has made it difficult to determine whether any actual discrepancies exist and/or which claimed discrepancies may have logical explanations. Moreover, certain key alleged discrepancies have indeed been explained and shown not to be discrepancies. Thus, [R&R] is not able to conclude that any additional cited perceived discrepancies call the reliability of Kingtom's documentation into question.

*Id.* at 10.  For R&R, "Kingtom has provided maximum figures for its production capabilities and capacity, as well as production records that do not exceed those maximums. There is nothing in the record that contradicts the figures provided by Kingtom." *Id.* at 8.

### 3.        R&R Declined to Apply Adverse Inferences

Moreover, R&R found that the record did not support the use of adverse inferences. Because of TRLED's lack of follow up (e.g., by sending supplemental requests for information to Kingtom) regarding *perceived* discrepancies in the record, Customs failed to confirm whether any *actual* deficiencies in the record existed. For R&R, Kingtom could hardly be found to have "failed to cooperate by not acting to the best of [its] ability to comply with a request for information" when no request had ever been made. 19 U.S.C. § 1517(c)(3)(A); *see* Remand Results, Addendum at 10 ("Failure to provide information that was not requested by [Customs] during the investigation is not a lack of cooperation.").

### 4.        R&R's Consideration of Kingtom's Ties to China

Finally, R&R acknowledged Kingtom's ties to China. These include the company's ownership, nationality of some employees, and its sourcing of some equipment and supplies. R&R found, though, that "the record does not support a finding that these ties somehow negate the evidence of production in the Dominican Republic to support a conclusion that the aluminum extrusions were not produced at Kingtom's manufacturing facility in the Dominican Republic, but rather, were transshipped from China." Remand Results, Addendum at 8. In other words, what

Customs was seeking to determine was whether Chinese-manufactured aluminum extrusions were transshipped through the Dominican Republic for purposes of evasion. Absent any evidence of actual transshipment, however, evidence of Chinese ties was immaterial.

Thus, on remand R&R determined that "there [was] not substantial evidence to support a finding of evasion as to the Importers," and reversed its original finding of evasion. *Id.* at 11.

Following publication of the Remand Results, and in accordance with the court's scheduling order, the parties filed their respective motions for judgment on the agency record and comments on the Remand Results.

## STANDARD OF REVIEW

This Court "shall examine . . . whether the Commissioner fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2).

## DISCUSSION

Four motions for judgment on the agency record are before the court, filed by (1) Defendant-Intervenor the Committee, (2) Plaintiffs H&E Home and Classic Metals, (3) Consolidated Plaintiffs Global Aluminum, Industrias, Puertas, and JL Trading, and (4) Plaintiff-Intervenor Kingtom.

## I.      The Parties' Arguments

### A.      Defendant-Intervenor's Arguments

By its motion, Defendant-Intervenor the Committee argues that Customs' Remand Results are arbitrary and capricious and that R&R's factual findings on remand are not supported by substantial evidence. Thus, the Committee contends that the court should remand this matter to Customs for reconsideration. *See* Def.-Int.'s Cmts. at 34.

#### 1.      Using the Same Evidence to Reach a Different Result Was Arbitrary

First, the Committee argues that "R&R's remand [decision, i.e., a finding of no evasion,] is arbitrary, capricious, and an abuse of discretion because the agency relied on most, if not all, of the same evidence that it initially found to support a finding of evasion." Def.-Int.'s Cmts. at 14. For the Committee, "R&R failed to provide sufficient justification for treating the same evidence differently. The agency summarily decided that the same evidence does not demonstrate evasion, without providing a rational explanation, or made findings that are unreasonable and unsupported by the record." *Id.*

For the Committee, R&R interpreted evidence related to Kingtom's production capacity and capability differently on remand than it had in its original evasion determination "without providing a rational explanation." *Id.* For instance, the Committee argues:

- [In its original evasion determination] R&R found the facility photographs and videos from Kingtom to not indicate production levels that would match the volume of extrusions exported, noting that the videos (which were several minutes long) did not evidence a significant number of employees working different machines and showed some equipment sitting idle.

- [In its original evasion determination] R&R also noted that U.S. Government officials observed minimal production during their site visit.

- In addition, [in its original evasion determination] R&R found that Kingtom's daily production records corroborated that Kingtom's extrusion presses did not operate at anywhere near full capacity. R&R found affidavits provided by

certain importers with respect to site visits unreliable in assessing whether Kingtom manufactured the total volume exported.

- R&R explained [in its original evasion determination] that Kingtom's mold information indicated the use of specific presses on dates preceding when Kingtom's equipment list stated that those presses went into operation.

- [In its original evasion determination] R&R found that the mold information contained additional data that did not align with the production records, including work group numbers that did not appear on the production records and, at times, stating that the mold was used on days/shifts where the production records indicated that no such production occurred.

*Id.* at 17-18. For the Committee, Customs' failure to explain how it came to a different conclusion than those reached above renders its decision on remand arbitrary.

### 2.    No Follow-Up Is Required in a TRLED Investigation

Second, the Committee argues that R&R erred when it found that TRLED failed to follow up on the discrepancies in the record. For the Committee, R&R "misunderstands the nature of the agency's investigation." Def.-Int.'s Cmts. at 22. The Committee argues that

TRLED initiated the investigation because there was evidence that Kingtom could not have produced all the extrusions entered into the United States. The Importers' defense was that Kingtom did produce all the extrusions. To prove this claim, the Importers (with Kingtom) needed to demonstrate that Kingtom's production records could be tied up without any gaps, to support the volume of extrusions that entered the United States. The widespread discrepancies mean that the Importers and Kingtom could not justify their defense. They were unable to rebut TRLED's findings.

*Id.* Thus, for the Committee, Customs "was under no obligation to *affirmatively* determine that Kingtom used Chinese extrusions," and did not have to ask follow up questions. *Id.* at 23 (emphasis added).

### 3.    Widespread Discrepancies Are Substantial Evidence of Evasion

Third, the Committee maintains that R&R's factual findings on remand are not supported by the record evidence. For the Committee, R&R erroneously dismissed discrepancies in the

record regarding Kingtom's (1) suppliers, (2) purchases of raw materials, (3) financial transactions, (4) production activity, and (5) size capabilities of its extrusion presses by giving these issues "cursory" review, or no review. Def.-Int.'s Cmts. at 23-30. The Committee argues that the "discrepancies" in the evidence are *themselves* substantial evidence of evasion, and R&R erred in finding otherwise. *See id.* at 21 ("The widespread discrepancies themselves constituted substantial evidence that Kingtom did not produce the claimed extrusions."). For example, regarding suppliers, the Committee argues that some discrepancies in the record made it unclear whether all of Kingtom's suppliers were identified, what each supplier sold to Kingtom, when, and for what price. Thus, for the Committee, Customs "could not confirm that Kingtom did not actually obtain Chinese extrusions from these suppliers." *Id.* at 24.

Regarding purchases of raw materials, the Committee argues that discrepancies with respect to aluminum ingots and scrap, the main inputs for the production of aluminum extrusions, "indicated that Kingtom did not have the necessary raw materials to produce the claimed volume of aluminum extrusions." *Id.* at 26.

Regarding financial transactions, the Committee argues that R&R "erred in dismissing the discrepancies between Kingtom's bank statements and its account receivable records or the bank statements of certain importers." Def.-Int.'s Cmts. at 27. By declaring that many of the discrepancies were for small amounts, i.e., bank transaction fees, without going deeper into the analysis of all of the discrepancies was an abuse of discretion. *Id.* at 27-28.

As to production activity, the Committee argues that R&R "improperly discounted" the expert evidence[18] supplied by the Committee and a government report[19] indicating "that Kingtom had minimal production," when R&R found that this evidence only provided "snapshots" of production and therefore did not undermine the body of production evidence on the record from Kingtom. Def.-Int.'s Cmts. at 28. For the Committee, the fact that each observed minimal production at different times at Kingtom "supports a conclusion that Kingtom had minimal production." *Id.*

As to the size capability of Kingtom's extrusion presses, the Committee argues that R&R erred by "improperly dismiss[ing]" the expert evidence that the Committee placed on the record as merely a generalized statement that some presses could not produce the size of aluminum extrusions exported to the United States, and that there was no evidence that the size limitations of Kingtom's presses were actually tested. Def.-Int.'s Cmts. at 29. For the Committee, the expert evidence "raised questions as to Kingtom's capacity and capability, in addition to other evidence, indicating that Kingtom did not manufacture the claimed extrusions." *Id.*

### 4.    Customs' Failure to Apply an Adverse Inference Was Arbitrary

Finally, the Committee argues that Customs acted arbitrarily by failing to apply an adverse inference to find evasion because importers Global Aluminum, Industrias, Puertas, and JL Trading failed to cooperate to the best of their ability with Customs' request that they resubmit public

---

[18]      The Committee attached as an exhibit to its allegation, a declaration by [[

]]. Def.-Int.'s Cmts. at 29 n.14.

[19]      The Committee states that "Homeland Security Investigations agents, along with [Customs] import specialists and D.R. Customs conducted a Central America – Dominican Republic Free Trade Agreement (CAFTA-DR) site verification at Kingtom. TRLED placed this report on the record of the investigation." Def.-Int.'s Cmts. at 17 n.10 (citing Attaché Report at 4).

summaries of certain documents. The Committee does not dispute that Customs has discretion under the statute when deciding whether to apply an adverse inference but argues that it was arbitrary for Customs to treat compliant and non-compliant parties alike, i.e., not to apply adverse inferences to any party. *See* Def.-Int.'s Cmts. at 33 ("To require select parties to comply with the agency's requests for information but not others is arbitrary, capricious, and an abuse of discretion."). For the Committee, rather than "rectify procedural deficiencies," as TRLED claimed was its mandate on remand, it created further deficiencies by not applying an adverse inference when Global Aluminum, Industrias, Puertas, and JL Trading failed to provide public summaries as required by Customs' regulations. *Id.*

### B.    Defendant's Response to the Committee's Motion

For its part, Defendant, on behalf of Customs, asks the court to find that Customs "did not act arbitrarily, capriciously, or erroneously in concluding, upon remand, that there is not substantial evidence on the record to support a finding of evasion." Def.'s Resp. at 2. Defendant responds to each of the Committee's arguments.

### 1.    Response to the Same Evidence, Different Result Argument

First, Defendant responds to the Committee's argument that Customs acted arbitrarily because, as the Committee claims, "the agency relied on most, if not all, of the same evidence that it initially found to support a finding of evasion." Def.-Int.'s Cmts. at 14. Defendant points out that the remand record, which ran to thousands of pages, contained "supplementary materials that were not available to [Customs] when issuing its affirmative determinations of evasion." Def.'s Resp. at 8. These include "public summaries and party arguments with respect to such, certain entry data reports, fact sheets, importer responses to [Customs'] request for information . . . and record

evidence from EAPA 7348." *Id.* 8-9 (citing Remand Results, Addendum at 2 n.2); *see also, e.g.*,

Remand Record, ECF Nos. 76-77.

Moreover, for Defendant, "the Remand [Results] not only considers a more complete,

supplemented record, but also methodically, and in detail, critically reviews the record materials

and arguments cited by the TRLED Determination *but left unaddressed in the R&R Review*" of

that determination in the de novo administrative review. Def.'s Resp. at 11. In Defendant's words,

R&R "failed to conduct a thorough and comprehensive *de novo* review and analysis of the TRLED

Determination in the first place," but did so on remand. *Id.*

But for Defendant, even if Customs did largely rely on the same evidence in coming to a

different conclusion as to evasion, "that does not, in and of itself, render the Remand [Results]

arbitrary, capricious, or an abuse of discretion." Def.'s Resp. at 9. Rather, the law requires that

when an agency changes its position, it must "acknowledge its change and provide a rational

explanation for the change." *Id.* at 9 (quoting *Invenergy Renewables LLC v. United States*, 44 CIT

__, __, 476 F. Supp. 3d 1323, 1349 (2020) (in turn, citing *FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 517 (2009)). And here, Defendant asserts, Customs has done so.

Defendant points out that Customs explicitly acknowledged that it was "reversing course"

in the Remand Results, when it stated:

> Further review and analysis of the administrative record as transmitted by
> TRLED to R&R, both prior to the issuance of the R&R [final affirmative
> determination] and during this remand period, and the written comments on the
> draft remand redetermination submitted by some of the parties during this remand
> period, continue to lead R&R to reach a different conclusion in this remand, from
> the conclusion reached in [its final affirmative determination].

Remand Results, Addendum at 3. Additionally, for Defendant, Customs provided a rational

explanation for the change, when it stated that it was reversing course as it did in *Global Aluminum*,

a case involving "almost identical" facts and circumstances, i.e., "many of the same record

documents"[20] and overlapping periods of investigation. *Id.* Specifically, the two periods overlapped from January 2019 to November of 2020. *See supra* note 13. Defendant asserts that "[Customs] has now consistently found no substantial evidence of evasion in all related Kingtom EAPA cases." Def.'s Resp. at 11.

For Defendant, only on remand did R&R "conduct a thorough and comprehensive *de novo* review and analysis of the TRLED's [original affirmative evasion determination]." *Id.* In contrast to R&R's original two-page analysis, that largely "mirrored" the findings of the TRLED's prior determination, the Remand Results "not only considers a more complete, supplemented record, but also methodically, and in detail, critically reviews the record materials and arguments cited by the TRLED [in its prior determination] but left unaddressed in the R&R['s original affirmative evasion determination]." *Id.*

Taking R&R's analysis of Kingtom's production capacity and capability as one example, Defendant emphasizes that Customs "specifically addressed the deficiencies of the TRLED['s prior findings] and the [prior] R&R . . . conclusions with respect to Kingtom's production abilities and its Chinese ties, and then explained in granular detail why it disagrees with those findings and conclusions." Def.'s Resp. at 12-13 (citing, for example, the Remand Results, Addendum at 5 where R&R cited record evidence including "purchase orders, employee records, contracts, bank records, invoices, financial statements, production records, raw material purchase documentation, videos, and photographs, all indicating that Kingtom had the capacity and capability to produce aluminum extrusions in its Dominican Republic factory in the quantities that were exported to the United States on a custom order basis").

---

[20]        Documents from the administrative record of EAPA Case No. 7348 were placed on the record of the instant investigation (EAPA Case No. 7423).

Thus, for Defendant, Customs examined the record evidence on remand and adequately explained the reasons for making a non-evasion determination.

### 2.      Response to the No Follow-Up Argument

Next, the Committee has argued that R&R misunderstood the nature of EAPA investigations when it found that TRLED failed to follow up on discrepancies in the record. Def.-Int.'s Cmts. at 22. Defendant for its part maintains that, even if TRLED had no obligation to follow up, "any discrepancies in and of themselves, especially when they have otherwise logical explanations (as [Customs] discussed in the [Remand Results]) and no direct nexus to evidence of transshipment, do not constitute substantial evidence of evasion." Def.'s Resp. at 20.

### 3.      Response to the Argument That Widespread Discrepancies Are Substantial Evidence of Evasion

Defendant has argued that the discrepancies the Committee points to do not amount to substantial evidence of evasion. For example, Defendant claims that discrepancies with respect to Kingtom's suppliers and raw material purchases (aluminum ingots and scrap) were not significant, when Kingtom's explanations on the record were taken into account, including that the company did not source materials from China during the period of investigation. Def.'s Resp. at 20 ("[T]ogether with myriad other records, raw material purchase documentation demonstrated that Kingtom had the capability to produce aluminum extrusions in the Dominican Republic.").

Similarly, with respect to discrepancies in bank statements, Defendant notes that R&R stated that the discrepancies were small amounts, the majority of which were explained as resulting from transaction fees charged by the bank. *Id.* at 21; *see* Remand Results, Addendum at 6 ("[M]inor discrepancies in financial records or invoices are not indicative of a lack of aluminum extrusion production capacity.").

As to the Committee's argument that R&R unreasonably discounted an industry expert's declaration stating that the expert observed only minimal production capacity at Kingtom's facility and that the size of Kingtom's dies did not match what was sold in the United States, the Defendant contends that R&R reasonably pointed to the lack of evidence supporting the expert's declaration. Specifically, "[Customs] explained that any lack of production observed on isolated occasions does not mean that Kingtom's machines were not operational at other times." Def.'s Resp. at 22. Also, R&R noted that these observations about production and die size were not "tested and proven correct." *Id.* at 21.

For Defendant, "the minor record discrepancies that [the Committee] views as evidence of evasion, [Customs], on remand, has placed in their overall context, provided commonsense explanations, and noted that without . . . follow-up, are little more than circumstantial grounds to speculate on an alleged, but unproven transshipment scheme." *Id.* at 22.

### 4.    Response to Adverse Inferences Argument

Finally, Defendant maintains that Customs' decision not to apply adverse inferences on remand was "correct." Def.'s Resp. at 23. For Defendant, not only does the statute make it clear with the use of permissive language ("may") that to use an adverse inference or not "is entirely within the purview of the agency," but Customs "had good reason to not impose adverse inferences here." *Id.*

These reasons, it seems, include an acknowledgement by Customs in its brief before the court that on remand, it "arguably exceeded the scope of the [Remand Order] by requesting that *all of the parties* submit certain revised documents with public summaries of bracketed business confidential information in compliance with" Customs regulation § 165.4(a)(2). *Id.* at 24 (emphasis added). Apparently, there was some discussion between Defendant, as counsel for

Customs, and counsel for Industrias, Puertas, and JL Trading regarding the scope of the Remand Order and whether the parties should request a clarification of the scope from the court as to whether only Customs, or also all parties, should be required to resubmit public summaries. Following these discussions, Customs itself "advised [its counsel, i.e., the lawyers on the Defendant's brief,] that should [Global Aluminum, Industrias, Puertas, and JL Trading] not provide revised public summaries, there would be no grounds for adverse inferences." *Id.* at 25. This information was communicated by Defendant, on behalf of Customs, to counsel for Industrias, Puertas, and JL Trading.[21] *Id.*

For these reasons, Defendant asks the court to sustain the Remand Results.

### C.    Plaintiffs', Consolidated Plaintiffs', and Plaintiff-Intervenor's Arguments

Because of R&R's reversal of its original affirmative evasion determination, the Plaintiff parties now find themselves on the same side as Customs and hence Defendant. Thus, by their respective motions, Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenor Kingtom make many of the same arguments as Defendant and seek the same ruling in this case.[22] They ask the court to sustain the Remand Results because (1) Customs "adequately explained its reasoning and decision on remand to change its position with respect to the finding of evasion;" (2) Customs' determination that "the record does not contain substantial evidence of evasion of the Orders is adequately explained and supported;" and (3) Customs' "decision not to apply adverse inferences on remand was not arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance

---

[21]     Global Aluminum had gone out of business by that time and was no longer participating in the litigation.

[22]     Plaintiffs' comments incorporate by reference the arguments of Consolidated Plaintiffs, Plaintiff-Intervenor, and Defendant. *See* Pls.' Cmts. at 2. Plaintiff-Intervenor's comments incorporate by reference the arguments of Consolidated Plaintiffs and Defendant. Pl.-Int.'s Cmts. at 12 n.2.

with law." Pls.' Cmts. at 2; *see also* Consol. Pls.' Cmts. at 3 ("[T]he Remand Redetermination correctly reverses its finding of evasion in the instant case."); Pl.-Int.'s Cmts. at 1 (requesting "that the Court affirm the Remand Determination in its entirety").

Consolidated Plaintiffs do take issue, however, with Customs' interpretation of the scope of the Remand Order and contend that Customs erred when it asked the parties to resubmit public summaries of business confidential documents. Consolidated Plaintiffs seek no remedy for this alleged error because ultimately, as Defendant has noted in its Response to the Committee's motion for judgment on the agency record, Customs recognized what it perceived to be its error and did not apply an adverse inference to the Consolidated Plaintiffs (Global Aluminum, Industrias, Puertas, and JL Trading) for failing to comply with Customs' request that they resubmit public summaries.

For its part, Plaintiff-Intervenor Kingtom argues that Customs made no error on remand:

> At its essence, this case involves [R&R] showing the integrity to admit that its previous determination was not based on a *de novo* review of the record and was instead based on alleged discrepancies that were largely drawn from the record of a related but separate EAPA determination [i.e., EAPA Case No. 7348, the investigation at issue in *Global Aluminum*] that was largely based on adverse inferences. [R&R] had subsequently reconsidered and reversed that related EAPA decision and this Court affirmed that reversal. In its Remand Determination here, [R&R] has corrected this mistake by issuing a new decision that is based on a fair interpretation of all the record evidence, and that is consistent with its finding in the related EAPA case that served as the foundation for its original evasion determination in this case.

Pl.-Int.'s Cmts. at 11. Accordingly, Kingtom urges the court to sustain the Remand Results: "The Remand [Results] should be affirmed because [R&R] acted well within its discretion and consistent with the Court's remand instructions by reconsidering and reweighing the record evidence." *Id.*

## II.    The Court's Analysis

For the following reasons, the court finds that (1) Customs complied with the Remand Order, (2) its negative evasion determination is supported by substantial evidence and is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, and (3) Customs did not err when it declined to apply an adverse inference to Consolidated Plaintiffs.

### A.    Customs Complied with the Court's Remand Order

As an initial matter, the court looks at whether Customs has complied with the court's Remand Order. *See Diamond Tools Tech. LLC v. United States*, 46 CIT __, __, 609 F. Supp. 3d 1378, 1382 (2022) ("On remand, the court also reviews the Remand Results for compliance with the court's remand order." (quotation omitted)).

In the Remand Order, the court credited the reasons stated in Defendant's Remand Motion, i.e., that remand was needed so that Customs could "correct certain procedural deficiencies in the administrative record," including: (1) to "provide the parties with public summaries of business confidential information [that Customs placed on the underlying administrative record,] including summaries of site visits and responses to [Customs'] Requests for Information"; (2) to place on the record "multiple documents [that] were mistakenly omitted from the administrative record, and were thus not reviewed by R&R when rendering its decision on evasion"; and (3) to allow Customs to "reevaluate the record evidence in light of its remand determination in [*Global Aluminum Distributor LLC v. United States*, Court No. 21-00198] and to reconsider its finding of evasion." Remand Motion at 4-6. Holding that that Customs' reasons for requesting remand, as stated in its motion, were "substantial and legitimate," the court granted the motion. *See* Remand Order at 2.

As to the first remand ground, there is no dispute that TRLED complied with the public summarization requirement. *See* 19 C.F.R § 165.4(a)(2) ("The public version must . . . contain a

summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information."). It is worth repeating that Customs' Remand Motion had stated that remand was necessary because "[*Customs*] [had] placed certain business confidential information on the underlying administrative record" without including public summaries in violation of 19 C.F.R. § 165.4. Remand Motion at 5 (emphasis added). On remand, Customs placed on the record public summaries of confidential information that it had originally omitted to provide the parties, as required by § 165.4(e). *See* Remand Results at 10 ("TRLED added revised public summaries to its previously bracketed and redacted public versions of business confidential documents.").

The court acknowledges, as set out in Defendant's brief, the discussion among counsel regarding whether TRLED exceeded the scope of the Remand Order when it asked the parties to resubmit public versions of documents that had previously been placed on the record. It is true that Customs' Remand Motion did not state that *the parties* had failed to submit public summaries of business confidential information, only *Customs*. Thus, the court is inclined to agree that requiring resubmission of the parties' public summaries was not necessarily directed by the Remand Order. Nonetheless, it is difficult to see any harm caused by Customs' apparent expansion of the scope of the Remand Order, since it does not appear that Consolidated Plaintiffs complied with Customs' request on remand to review, revise, and resubmit previously submitted public summaries.[23] Rather, Consolidated Plaintiffs only altered the *format* as Customs requested, by "flatten[ing],

---

[23]     *See* Consol. Pls.' Cmts. at 8-9 ("Since all the public summaries of the responses to the Requests for Information submitted by Industrias Feliciano, JL Trading Corp. and Puertas y Ventanas *had already been so bracketed as to 'permit a reasonable understanding of the substance of the information'* [and] *redacted . . .* when these documents were all timely resubmitted on September 24, 2022[] they were all reformatted as required by CBP's instruction of September 16, by being 'flattened, OCR'd and optimized' in Adobe.").

OCR'[ing] and optimiz[ing]" the documents in Adobe. *See* Consol. Pls.' Cmts. at 9. In any event,

Consolidated Plaintiffs do not seek a remedy for TRLED's erroneous interpretation of the court's

order.

As to the other grounds for remand, there is no dispute either that TRLED transmitted

documents omitted from the record to R&R, or that R&R complied with the court's instruction to

reconsider its earlier evasion determination.

Accordingly, the court finds that Customs complied with the Remand Order.

## B.    The Court Finds No Error with Customs' Remand Results

Under the standard of review in EAPA cases, as this Court has explained:

> The court shall determine "(A) whether [Customs] fully complied with all
> procedures under [19 U.S.C. §§ 1517(c) and (f)]; and (B) whether any
> determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion,
> or otherwise not in accordance with law." [Customs] determination of whether an
> importer evaded [the Orders] must be supported by substantial evidence on the
> record.

*Ad Hoc Shrimp Trade Enf't Comm.*, 47 CIT at __, 578 F. Supp. 3d at 1317 (first quoting 19 U.S.C.

§ 1517(g)(2)(A)-(B); and then citing *id.* § 1517(c)(1)(A)). That is, the court must apply the

arbitrary and capricious standard when reviewing Customs' compliance with the EAPA

procedures in § 1517(c) (regarding determinations) and (f) (regarding administrative reviews), as

well as its evasion determinations. The procedures under subsection 1517(c)(1) apply to evasion

determinations. Paragraph 1517(c)(1)(A) requires that Customs base its evasion determination on

substantial evidence: "the Commissioner shall make a determination, *based on substantial*

*evidence*, with respect to whether such covered merchandise was entered into the customs territory

of the United States through evasion." 19 U.S.C. § 1517(c)(1)(A) (emphasis added). Thus, when

applying the arbitrary and capricious standard of review to Customs' evasion determination here,

the court must examine whether Customs supported its negative evasion determination with substantial evidence.

### 1.    Substantial Evidence Supports Customs' Negative Evasion Determination

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted). An agency's findings "may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *U.S. Steel Corp. v. United States*, 97 F.4th 1364, 1370 (Fed. Cir. 2024) (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015)).

The Committee does not argue that the evidence on the record is capable of one and only one interpretation. It argues instead that Customs, having interpreted the evidence and concluded that evasion had occurred during the investigation, acted arbitrarily when it reconsidered that evidence on remand and failed to provide "a rational explanation" for interpreting the evidence differently. Def.-Int.'s Cmts. at 14. In particular, the Committee points to certain evidence related to Kingtom's production capacity and capability—which bore on the core question in this case, i.e., "whether Kingtom had the ability to produce and did produce the aluminum extrusions it exported to the United States during the period here at issue." Remand Results, Addendum at 3.

Contrary to the Committee's contentions, Customs adequately explained its reasons for interpreting the evidence differently on remand. For instance, the Committee asserts that in its original affirmative evasion determination "R&R found the facility photographs and videos from Kingtom to *not* indicate production levels that would match the volume of extrusions exported." Def.-Int.'s Cmts. at 17 (emphasis added). In the Remand Results, though, it is clear that R&R

examined photographic and video evidence within a larger evidentiary context, taking into account

Kingtom's own production records:

> The record evidence includes copies of purchase orders, employee records, contracts, bank records, invoices, financial statements, production records, raw material purchase documentation, *videos, and photographs, all indicating that Kingtom had the capacity and capability to produce aluminum extrusions in its Dominican Republic factory in the quantities that were exported to the United States on a custom order basis*.

Remand Results, Addendum at 5 (emphasis added). As noted, R&R found with respect to

production capacity, "Kingtom provided the monthly production capacity for three (3) aluminum

extrusion presses in its initial [Request For Information] Response, demonstrating the ability to

manufacture the full amount of goods it exported to the United States." *Id.* at 4. Moreover, R&R

stated regarding Kingtom's production capability:

> As shown within the record, Kingtom documented its daily production per each aluminum extrusion press as part of its normal course of business and provided such documentation to [Customs] in response to the initial Request for Information . . . in EAPA Cons. Case No. 7348. There is nothing in the record to discredit these daily production records as unreliable or to otherwise contradict Kingtom's assertions that such records were kept in the normal course of business.

*Id.*

Additionally, the Committee asserts that in its prior decision R&R "noted that U.S.

Government officials observed *minimal* production during their site visit." Def.-Int.'s Cmts. at 17

(emphasis added). In the Remand Results, R&R stated that "[o]n remand, we determine that

TRLED and R&R improperly relied on the extent of production observed during these short site

visits that took place months apart to extrapolate Kingtom's monthly production capacity, while

not affording any weight to the more complete production information submitted by Kingtom,"

e.g., the daily production that Kingtom documented for each aluminum extrusion press and placed

on the record. Remand Results, Addendum at 4, 8.

These two examples are indicative of the way R&R explained its change of position on remand with respect to Kingtom's production data. On remand, R&R's perspective on the evidence changed when it considered the production data Kingtom had placed on the record, instead of dismissing it out of hand as unreliable, as it had in the original evasion determination. The court does not find R&R's approach to reconsidering the evidence arbitrary or lacking in sufficient explanation. Customs clearly "acknowledge[d] its change and provide[d] a rational explanation for the change." *Invenergy Renewables LLC*, 44 CIT at __, 476 F. Supp. 3d at 1349 (citing *Fox Television Stations, Inc.*, 556 U.S. at 517).

The other arguments raised by the Committee are similarly unpersuasive. The Committee claims, for instance, that TRLED was under no obligation to follow up on any perceived discrepancies in the record. But it could have. The statute clearly provides Customs with the "Authority to collect and verify additional information":

> In making a[n evasion] determination under paragraph (1) with respect to covered merchandise, the Commissioner may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by—
>
> (A) issuing a questionnaire with respect to such covered merchandise to—
>
> (i) an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise;
>
> (ii) a person alleged to have entered such covered merchandise into the customs territory of the United States through evasion;
>
> (iii) a person that is a foreign producer or exporter of such covered merchandise; or
>
> (iv) the government of a country from which such covered merchandise was exported; and
>
> (B) conducting verifications, including on-site verifications, of any relevant information.

19 U.S.C. § 1517(c)(2). Thus, it is difficult to fault R&R for questioning whether a failure to follow

up kept TRLED from getting an accurate picture of Kingtom's production capacity and capability.

Moreover, the court cannot agree with the Committee's argument that the claimed

discrepancies in the record as to Kingtom's (1) suppliers, (2) purchases of raw materials,

(3) financial transactions, (4) production activity, and (5) size capabilities of its extrusion presses

are *themselves* substantial evidence of evasion. Def.-Int.'s Cmts. at 21 ("The widespread

discrepancies themselves constituted substantial evidence that Kingtom did not produce the

claimed extrusions."). These so-called discrepancies were analyzed and dismissed by R&R on

remand: "As explained above, many of the discrepancies upon which the TRLED . . . and the

R&R . . . relied [in finding evasion] have logical explanations that should have received more

consideration during the original *de novo* review process."[24] Remand Results, Addendum at 10.

On remand, R&R conducted, for the first time in this proceeding according to Defendant,

"a thorough and comprehensive de novo review and analysis of the TRLED's [original affirmative

evasion determination]," and concluded that substantial evidence did not support a finding of

---

[24]    R&R found that the most significant of the "discrepancies" was the perceived misalignment of Kingtom's production and sales data. For example, R&R discussed Kingtom's "multi-month timeline for an order's receipt, production and exportation," which it found was illustrated by Kingtom in a response to Customs' request for information in EAPA Case No. 7348, which was placed on the record here. Remand Results, Addendum at 5-6. Kingtom's response "shows that the order was placed in February 2020 but was not fully prepared and ready for shipment until March 2020." *Id.* For R&R, "it stands to reason that production and sales numbers cannot be viewed within rigid timeframes and expected to mirror one another due to fluctuations and the realities of manufacturing. *This alleged discrepancy goes to the core question presented in this case and is indeed not a discrepancy.*" *Id.* at 6 (emphasis added). Another example of a discrepancy that R&R found was explained by Kingtom's records was the "differences found between Kingtom's bank statements and its accounts receivable records or the bank statements of some of the Importers" made these documents unreliable. *Id.* Upon reconsideration, R&R found that "[a] majority of those differences in payment amounts by the Importers and the actual amount deposited into Kingtom's bank account are consistently small figures," which appear to be transaction fees charged by Kingtom's bank. *Id.*

evasion. *See* Def.'s Resp. at 11. Upon reconsideration of the record evidence, R&R found that it could rely on the evidence of Kingtom's production capability and capacity, and that the evidence did not support a finding of evasion. Claimed "discrepancies" had reasonable explanations, or simply did not matter to the central question in the case—"whether Kingtom had the ability to produce and did produce the aluminum extrusions it exported to the United States during the period here at issue." Remand Results, Addendum at 3.

The court thus finds that Customs both acknowledged that it was reversing the affirmative evasion determination reached by TRLED and affirmed by R&R, and gave a rational explanation for having done so. Therefore, Customs did not act arbitrarily when finding that substantial evidence supports a determination of no evasion.

### 2.    Customs Did Not Act Arbitrarily When It Declined to Apply Adverse Inferences

The Committee argues that Customs acted arbitrarily by not applying adverse inferences against Consolidated Plaintiffs Global Aluminum, Industrias, Puertas, and JL Trading for failing to provide public summaries after TRLED gave them a second chance to do so. The court disagrees.

The statute authorizes the agency to decide whether to apply adverse inferences by its use of the permissive "may." 19 U.S.C. § 1517(c)(3)(A) ("If the Commissioner finds that a party or person . . . has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner *may*, in making a[n evasion] determination under [19 U.S.C. § 1517(c)(1)], use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination." (emphasis added)); *id.* § 1517(c)(3)(B) (an adverse inference "*may* be used . . . without regard to whether another person involved in the same transaction or transactions under examination has provided the

information sought by the Commissioner, such as import or export documentation." (emphasis added)). Thus, under the statute, it is for Customs to decide whether or not applying an adverse inference is warranted due to a party's failure to do its best to comply with a request for information.

The word "may," however, does not give Customs carte blanche. Notwithstanding the permissive wording of the adverse inference statute, Customs, under the circumstances presented here, including the previous application of adverse facts available, gave a reason for its decision.[25] *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) ("Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962). In the Remand Results, Customs justified its decision not to apply an adverse inference, in part, because it would have been "futile" to do so, because "[Customs] already reviewed and considered confidential versions of all documents and the parties have already accessed such documents under the judicial protective order." Remand Results at 18-19. In other words, the failure of Global Aluminum, Industrias, Puertas, and JL Trading to resubmit public summaries of confidential information (information that all parties had access to anyway) did not create a factual gap in the record:

---

[25]     In its brief before the court, Defendant recounts communications among counsel in which Customs appears to have conceded that it construed the Remand Order too broadly by asking the parties to revise and resubmit public summaries, and that it therefore would not apply adverse inferences to Consolidated Plaintiffs for failing to do so. But *Customs itself* does not state its misunderstanding of the Remand Order's scope as a reason for not applying an adverse inference in the Remand Results. The court therefore does not consider Defendant's statements regarding the communications among counsel when analyzing the reasonableness of Customs' adverse inference decision on remand. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("[*SEC v. Chenery*, 332 U.S. 194 (1947)] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself.").

> [I]n determining that it would not apply adverse inferences, [Customs] considered the procedural posture of this case – that the original documents submitted by all parties are on the administrative record. As such, the failure of the four importers to resubmit revised public summaries did not create a gap of information on the administrative record, as on remand [Customs] was not requesting any new information, but revised public versions of information already on the administrative record. To apply adverse inference for failure to resubmit public versions, on remand, would be futile as [Customs] already reviewed and considered confidential versions of all documents and the parties have already accessed such documents under the judicial protective order.

Remand Results at 18-19. It is, of course, the case that whether or not a party's conduct results in gaps in the factual record is not determinative of the adverse inference issue. *See CEK Grp. LLC*, 47 CIT at __, 633 F. Supp. 3d at 1378-79 (rejecting the argument "that adverse inferences as defined by § 1517(c)(3) can only be applied when there is a gap in the record," and finding that according to the plain meaning of that statute, "whether a gap exists is not necessarily determinative" of whether Customs may use an adverse inference). But there is nothing in the law that prohibits Customs' consideration of the impact of a party's non-compliance on the completeness of the record when deciding whether, under a given set of facts and circumstances, to apply an adverse inference. The Committee does not claim, nor could it, that it was deprived of access to any information by Global Aluminum, Industrias, Puertas, and JL Trading's failure to resubmit public summaries because it had access to the business confidential documents themselves. Under the facts of this case, Customs has adequately explained its decision and did not act arbitrarily by failing to apply adverse inferences in this case.

Because Customs "fully complied with all procedures under subsections (c) and (f)" and the Committee has failed to show that "any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court sustains the Remand Results. *See* 19 U.S.C. § 1517(g)(2).

## CONCLUSION

Based on the foregoing, the Remand Results are sustained. Judgment will be entered accordingly.

                                                            ___/s/ Richard K. Eaton___
                                                                        Judge

Dated:          June 17, 2024
                New York, New York